IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ADRIAN PINTEA AND MARINELA PINTEA, ) <br> ) <br> PLAINTIFFS, ) <br> ) <br> v. ) <br> ) <br> JOSEPH VARAN, MATTHEW E. GURVEY, ) <br> LAW OFFICES OF MATTHEW E. GURVEY, P.C., ) <br> ) <br> DEFENDANTS. ) | No. 16-cv-5990 <br><br> Judge Thomas Durkin |

**MEMORANDUM OPINION AND ORDER**

The complaint alleges that Plaintiffs have been discriminated against on the basis of race and national origin in violation of the Fair Housing Act, 42 U.S.C. § 3601 *et seq*. ("FHA"), and the Civil Rights Act of 1866, 42 U.S.C. §§ 1981 and 1982. In addition, the complaint alleges claims under state law for attorney malpractice and breach of contract. Jurisdiction in this Court is predicated on federal question jurisdiction over Plaintiffs' discrimination claims and supplemental jurisdiction over Plaintiffs' state law claims. Defendant Joseph Varan and Defendants Matthew E. Gurvey and Law Officers of Matthew E. Gurvey, P.C. (referred to collectively as "Gurvey") have filed motions to dismiss the complaint. R. 10, 17, 18. For the reasons that follow, Defendants' motions are granted.

**DISCUSSION**

In deciding a Rule 12(b)(6) motion, the Court may consider the complaint itself, "documents that are attached to the complaint, documents that are central to

the complaint and are referred to in it, and information that is properly subject to judicial notice." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013). Courts also may take judicial notice of related court proceedings outside the pleadings without converting the motion to dismiss into a motion for summary judgment. *See Quincy Mall, Inc. v. Parisian, Inc.*, 27 Fed. App'x 631, 636 (7th Cir. 2001) ("In reviewing a motion to dismiss, we may look to matters of public record outside of the pleadings, including . . . public court documents[.]").

While the complaint sets forth a number of legal theories on which Plaintiffs base their claims for relief, it provides only minimal factual details to support those legal theories. As best the Court can tell from the facts set forth in the complaint and the parties' briefs, Plaintiffs are immigrants from Romania who owned a house in Chicago and a small rental property nearby. They fell behind on their mortgage payments and the lender began foreclosure proceedings on both properties. Desperate to save their properties from foreclosure, Plaintiffs entered into the transactions with Defendants that are the subject of the complaint. The transactions are described in a conclusory manner as a fraudulent scheme to deprive Plaintiffs of their money and property by falsely promising the rendition of legal services to avoid the foreclosure of Plaintiffs' properties. Plaintiffs allege, also in a conclusory manner, that they were targeted for this fraudulent scheme because of their status as immigrants from Romania who would be susceptible to being deceived.

### A. ADEQUACY OF FACTUAL DETAILS ALLEGED IN COMPLAINT TO PUT DEFENDANTS ON NOTICE OF THE CONDUCT FOR WHICH THEY ARE ALLEGEDLY LIABLE

#### 1. DEFENDANT VARDEN

Plaintiffs allege they were introduced to Defendant Varden through a Romanian realtor they knew. Varden convinced Plaintiffs that he could save their properties from foreclosure if they executed quit claim deeds in favor of companies he controlled. Plaintiffs executed at least one deed (apparently on the rental property) as directed by Varden. Although the complaint does not say specifically, it suggests that Varden's advice to Plaintiffs also involved having them enter into an arrangement for "group legal services." *See* R. 20 at 5 (¶ 21) (alleging that Defendants Varden and Gurvey "charged a set monthly fee [for legal services] whether any service was rendered or what services were rendered"). The "Group Legal Services" contract attached to the complaint, however, is between Plaintiffs and a company called Con Praedia LLC. The latter company is not named as a defendant, and its relationship, if any, to Varden is not disclosed. Under the contract, Plaintiffs were to pay an "initiation fee" of $1,247.22 and a monthly "membership fee" of $1,135.25 to Con Praedia. In return, Con Praedia would provide legal services through a licensed attorney to defend the foreclosure proceedings on Plaintiffs' behalf.[1] The contract was for a term of two years.

Plaintiffs had already made two payments under the Group Services Contract (the initiation fee and the first monthly membership fee) when they

---

[1] Con Praedia is not itself licensed to practice law.

allegedly "found out that Varan and others were perpetuating a fraudulent scheme." R. 20 at 4. Plaintiffs advised Varden they would not continue his services. He responded that he would "close" their files. But he did not return any money to Plaintiffs. In addition, the complaint alleges, Varden failed to cancel the quit claim deed he had convinced Plaintiffs to execute. But the complaint goes on to suggest that the property subject to the quit claim deed ultimately has in fact been reconveyed to Plaintiffs. Further factual details regarding the quit claim deed and how Plaintiffs recovered the property subject to that deed are missing from the complaint.

Neither the complaint on its face, nor Plaintiffs' response to Varden's motion to dismiss, offers a factual explanation of the conduct by Varden that might raise a right to relief under the federal statutes on which Plaintiffs rely beyond a speculative level. The only non-conclusory facts alleged as to Varden are (1) that he persuaded Plaintiffs "that he could save their home if they executed quit claim deeds in favor of companies he controlled," and, believing him, Plaintiffs "executed at least some of the deeds," R. 20 at 4 (¶ 13); and (2) that, when Plaintiffs complained about what they had come to believe was a "fraudulent scheme" engaged in by Varan and others not specifically identified, Varan "immediately responded he would 'close' their files" but failed to return the money Plaintiffs paid or to execute a quit-claim deed conveying their property back to them, *id.* (¶ 14). Insofar as Varen's alleged failure to return any money to Plaintiffs is concerned, that claim fails for lack of specificity because Plaintiffs do not allege that they gave

4

any money to Varen. The money they paid under the Group Legal Services contract was paid to Con Praedia, and Plaintiffs do not allege what connection, if any, Varen had to that company. Plaintiffs' allegation in paragraph 21 that Varan "charged a set monthly fee whether any service were [sic] rendered or what services were rendered" fails for the same reason. The only parties to the Group Legal Services contract are Plaintiffs and Con Praedia, and Plaintiffs have not alleged a factual basis for saying that *Varan* "charged a set monthly fee" or otherwise is liable for Con Praedia's charging of that fee.

Plaintiffs do allege specific conduct of Varan regarding the quit claim deed, namely, that he convinced them to execute the deed in favor of certain "non-defendant companies" controlled by him. Further, Plaintiffs allege that when they told Varan they did not want his services anymore, they expected him to convey the quit-claimed property back to them but he failed to do so. At the same time, however, Plaintiffs also allege that the "non-defendant companies" in whose favor Plaintiffs executed the quit-claim deed have "agreed to execute the deeds [returning the property back to Plaintiffs] within a time certain." R. 20 (¶ 14). Therefore, Plaintiffs' own allegations show that they did not suffer any harm as a result of the quit claim deed because it appears that they ultimately got the property back. Without any factual allegations to suggest otherwise,[2] the Court cannot say that

---

[2] Plaintiffs' brief in opposition to summary judgment confirms that Plaintiffs presently have ownership of the former rental property on which they previously had executed a quit claim deed, stating that Plaintiffs "have removed themselves" to that property because their present counsel was able to "save" it from foreclosure through a loan modification with the mortgagor. *See.* R. 21 at 3.

5

Plaintiffs have alleged a factual basis for a claim against Varan based on the quit claim deed.

Finally, Plaintiffs' general and conclusory allegation that Varan targeted them to be a victim of a fraudulent scheme to take their money with false promises of helping them avoid foreclosure on their properties also is not sufficient to put Varan on notice of their claim against him. The money they lost from the alleged scheme, according to the facts alleged in the complaint, was paid not to Varen but to a non-defendant company with no alleged connection to Varan, and Plaintiffs do not explain how the mere allegation that Varen suggested to them that they enter into the transaction provides a basis for holding Varen liable for their payment of money to that company. While the Court suspects Plaintiffs could provide more specific facts regarding Varan's connection to the alleged scheme to defraud, they have, for some unexplained reason, not done so. Without those additional facts, however, the complaint falls short of alleging a right to recover against Varan for his role in the alleged fraudulent scheme. The threadbare allegation that Varan acted as an advisor to Plaintiffs as to how to proceed in the foreclosure proceedings simply is not enough to hold Varan legally liable for Plaintiffs' losses.

    **2.**     **THE GURVEY DEFENDANTS**

Plaintiffs' factual allegations against Gurvey are somewhat more detailed than those against Varan. According to the complaint, Con Praedia hired Gurvey to provide the legal services promised to Plaintiffs in the Group Legal Services contract. Plaintiffs signed a retainer agreement with Gurvey acknowledging that

his fees were being paid by a third party. Instead of providing adequate legal services to defend against the foreclosure proceeding, Plaintiffs allege that Gurvey entered an appearance on their behalf and then did almost nothing else. Gurvey disputes that characterization of the services he rendered, setting forth in his motion to dismiss the steps he took in the foreclosure proceedings on Plaintiffs' behalf. In any event, the complaint does not provide sufficient facts to understand exactly what happened in the foreclosure proceedings. At most, the Court infers that Gurvey withdrew from his representation of Plaintiffs after they notified Varden of their desire to terminate his services, and the foreclosure proceedings continued with Plaintiffs being represented by their current attorney. Based on representations made in Plaintiffs' brief in opposition to Defendant' motions to dismiss, it appears that Plaintiffs ultimately lost title to the property where they originally had lived but were able to retain title to the smaller, former rental property, where they now reside.

Gurvey's alleged misconduct is tied specifically to the Retainer Agreements and Gurvey's representation of Plaintiffs in the state foreclosure proceedings pursuant to that Agreement. Despite a number of instances in which the complaint fails to give a clear picture regarding what Gurvey is alleged to have done or failed to do, unlike Varden the Court cannot say that Gurvey lacks sufficient notice regarding his conduct of which Plaintiffs complain and the way in which his conduct is connected to the alleged fraudulent scheme.

### B. LEGAL SUFFICIENCY OF PLAINTIFFS' CLAIMS BASED ON FEDERAL LAW

Plaintiffs allege that Gurvey failed to provide adequate legal representation during their foreclosure proceedings, and they urge that his failure, together with Varan's recruitment of them to enter into the Group Legal Services contract providing for Gurvey's services, are part of a broader fraudulent scheme of "lur[ing] people through a network relying upon language and cultural commonality to take advantage of people in foreclosure. They persuade people to pay high fees for illusory services to 'save' their homes and then persuade the same people to execute quit-claim deeds to their homes to Defendant Joseph Varan or to companies he controls." R. 20 at 1. The Court does not condone the victimization of a vulnerable class of people who are preyed upon by perpetrators of fraudulent schemes such as the one alleged in the complaint. Nevertheless, the Court concludes that the allegations in the complaint do not state a claim for relief under any of the federal statutes on which Plaintiffs rely.

To begin with, §§ 1981 and 1982 reach only race discrimination, not discrimination based on national origin. *See St. Francis Coll. v. Al-Khazrahi*, 481 U.S. 604, 607 n.2 (1987); *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 756 (7th Cir. 2006); *Bachman v. St. Monica's Congregation*, 902 F.2d 1259, 1261 (7th Cir. 1990). Plaintiffs allege they were discriminated against because they are Romanian immigrants. The Supreme Court has pointed out that "the line between discrimination based on ancestry or ethnic characteristics, and discrimination based on place or nation of . . . origin is not a bright one." *Saint Francis Coll.* 481 U.S. at

8

614 (Brennan, J., concurring). But, as the Seventh Circuit has recognized, "the majority of the Supreme Court has resolved much of this issue by defining race broadly to include identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics." *Pourghoraishi*, 449 F.3d at 756 (citing *Saint Francis Coll.*, 481 U.S. at 609). "When evaluating those identifiable classes, the Supreme Court has noted that it will look to see whether, at the time Congress passed § 1981, it intended to protect the specific group at issue." *Id.* (citing *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 617-18 (1987)). "As the Supreme Court's extensive historical research in *Saint Francis* made clear, many groups whom we would now label 'white'—Germans, Greeks, Swedes, Hungarians, Finns *etc.*—were, at the time Congress adopted § 1981, considered distinct races." *Id.* (citing *Saint Francis Coll.*, 481 U.S. at 611-12). Plaintiffs contend that Romanians fall into this group. But the Court notes that Plaintiffs' allegations focus more on the fact that they are immigrants than on the fact that they are immigrants from Romania. Nevertheless, the Court may set aside whether that distinction has any particular ramifications for present purposes. Instead, the Court will assume that Plaintiffs have stated a claim for race discrimination under §§ 1981 and 1982, and a claim for race and/or national origin discrimination under the FHA, based on their Romanian heritage.

The Court also does not decide whether Plaintiffs have adequately pled the existence of a contractual relationship with or a refusal to enter into a contractual relationship by Defendant Varan. Such an allegation is required for purposes of

9

Plaintiffs' § 1981 claim against Varan. *See Jones v. Culver Franchising Sys., Inc.,* 12 F. Supp. 3d 1079, 1087 (N.D. Ill. 2013). The parties have not addressed this issue, but the Court doubts, based on the current complaint, that Plaintiffs' § 1981 claim would survive as against Varan on this basis, at least not without additional factual allegations that have been omitted from the current complaint.

Finally, the Court notes that the FHA primarily concerns the sale or rental of housing, neither of which are at issue in this case. The Seventh Circuit has held that, in certain limited circumstances, post-sale discrimination may be actionable under the FHA. *See Bloch v. Frischholz,* 587 F.3d 771, 776 (7th Cir. 2009) (FHA may reach "post-acquisition discriminatory conduct that makes a dwelling unavailable to the owner or tenant, somewhat like a constructive eviction"); *id.* at 780 (discussing context in which certain claims other than constructive eviction claims might also proceed in a post-acquisition context); *id.* at 781-82 (same as to § 3617); *see also Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n*, 388 F.3d 327, 329 (7th Cir. 2004). Nonetheless, some courts have expressed doubt that other types of post-acquisition conduct are "sufficiently analogous to an attempted constructive (or actual) eviction, as suggested in *Halprin* and *Bloch*, to be actionable under the FHA." *Davis v. Wells Fargo Bank*, 685 F. Supp. 2d 838, 845 (N.D. Ill. 2010). Although the court in *Davis* was "not convinced that the FHA applie[d]" to the post-acquisition conduct in that case, it nevertheless assumed that it did and then granted summary judgment in favor of the defendants because the plaintiff had "not offered any evidence whatsoever that race played a part in

Defendants' decision-making process." *Id.* Neither party here has cited any case to the Court specifically addressing whether foreclosure-related conduct of third parties such as that described in the complaint falls within the ambit of the FHA. Without analyzing that question, the Court will assume that it does at least for purposes of the present motions.

Rather than resolve any of these other issues related to the sufficiency of Plaintiffs' federal claims, the Court prefers to address what it views as a more fundamental defect in those claims, which is that Plaintiffs have not alleged *discrimination*. The three statutes on which Plaintiffs rely for their federal claims are directed at conduct that is discriminatory: § 1981 prohibits discrimination in the terms and conditions of a contract; § 1982 prohibits discrimination in the right to hold or acquire property; and, the FHA prohibits discrimination in the sale or rental of housing or in the provision of services or facilities in connection therewith. Intentional discrimination[3] means "treating a person differently because of his

---

[3] Only intentional discrimination, otherwise known as disparate treatment, is cognizable under §§ 1981 and 1982. *See Gen. Bldg. Contractors Ass'n v. Penn.,* 458 U.S. 375, 389 (1982) ("§ 1981 reaches only purposeful discrimination"); *Morris v. Office Max, Inc.*, 89 F.3d 411, 415 (7th Cir. 1996) (same for both § 1981 and § 1982). A claim under the FHA, however, can be based on either disparate treatment (intentional discrimination) or disparate impact. *See Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.,* 135 S. Ct. 2507 (2015). The Court reads the complaint as attempting to allege only a disparate treatment claim. But even if Plaintiffs wanted to pursue a disparate impact claim under the FHA, the complaint still would be inadequate. Plaintiffs fail to specifically identify any facially neutral policy of Defendants, a necessary element of an FHA disparate impact prima facie case. *See, e.g., Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926, 934 (2d Cir. 1988) ("A disparate impact analysis examines a facially-neutral policy or practice, such as a hiring test or zoning law, for its differential impact or effect on a particular group."). "There can be no

11

race." *Vill. of Bellwood v. Dwivedi*, 895 F.2d 1521, 1529 (7th Cir. 1990). The complaint contains a single disparate treatment allegation, which is found in Count II alleging claims under §§ 1981 and 1982. Specifically, Plaintiffs state that "Defendants illegally offered Mr. and Mrs. Pintea a contract that was different in its performance, making, and conditions from contracts offered to white citizens based solely on their race." R. 20 at 9 (¶ 40). The Court finds this allegation too conclusory without further facts to support it. In what ways were the contracts Defendants offered to non-Romanians different in the "performance, making and conditions" than those offered to Plaintiffs? Nothing in the factual details of the complaint even hints at an answer.

In a comparable FHA discrimination case, the court noted that "the existence of non-minority buyers who were not sold defective homes" was of "critical importance" because "[d]isparate treatment, after all, requires some disparity in treatment." *Wiltshire v. Dhanraj*, 421 F. Supp. 2d 544, 553 (E.D.N.Y. 2005). To survive a motion to dismiss, the court said, the plaintiffs needed "to allege that such persons do, in fact, exist," and that the plaintiffs' "failure to do so dooms their discrimination claims." *Id.* While Plaintiffs have superficially met the pleading requirement noted by *Wiltshire* by alleging the existence of non-Romanians who

---

discriminatory impact of a facially neutral policy or practice to consider if none is alleged." *Roy v. Bd. of Cnty. Comm'rs*, 607 F. Supp. 2d 1297, 1308 (N.D. Fla. 2009). Moreover, even if Plaintiffs could amend the complaint to allege an identified policy or practice, an FHA claim based on a disparate impact theory would still be subject to dismissal for the same reason as Plaintiffs' disparate treatment claim fails, which is that the facts Plaintiffs allege do not plausibly support an inference that Defendants' conduct had a disparate impact on persons of Romanian descent versus persons of non-Romanian descent.

were given non-fraudulent contracts, in *Wiltshire*, the missing allegation (the existence of non-minority buyers who were not sold defective homes) could be supplied without further factual enhancement to be plausible. Here, on the other hand, the allegation of the existence of non-Romanians who were given non-fraudulent contracts needs further factual detail to make it plausible. More to the point, the Court does not think there are *any* facts that Plaintiffs plausibly could allege to make this allegation more plausible. The conduct at issue in the complaint is a fraudulent scheme, and an allegation that non-Romanian victims of Defendants' fraudulent scheme were treated better than Romanian victims of Defendants' fraudulent scheme simply makes no sense. The Court thus concludes that Plaintiffs have not plausibly alleged differential treatment on which a discrimination claim can be based.

Aside from Plaintiffs' inability to allege disparate treatment, Plaintiffs also cannot allege discriminatory motive, a separate requirement. *See Vill. of Bellwood*, 895 F.2d at 1530 ("Proof of discriminatory motive is critical in a Title VII disparate treatment case, although it can in some situations be inferred from the mere fact of differences in treatment.") (internal quotation marks and citation omitted). Discriminatory motive means racial or national origin animus. *See Anooya v. Hilton Hotels Corp.*, 733 F.2d 48, 50 (7th Cir. 1984) (per curiam) ("In the absence of an allegation of racial animus, either explicit or reasonably inferable from the pleadings, plaintiff cannot maintain his section 1981 action."); *Padron v. Wal-Mart Stores, Inc.*, 783 F. Supp. 2d 1042, 1054 (N.D. Ill. 2011) (plaintiffs could bring a

racial discrimination claim under § 1981 because they "alleged that they have dark-colored skin, eyes and hair and that they are members of a racial minority, which could give rise to an inference of racial animus"). Plaintiffs attempt to meet this pleading requirement in this case by alleging that they were targeted for Defendants' fraudulent scheme "because of" their status as immigrants from Romania.

The same counsel who represents Plaintiffs brought a similar "victim targeting" claim in *Davis v. Fenton*, 26 F. Supp. 3d 727 (N.D. Ill. 2014). In that case, the plaintiff alleged that the defendants "violated the Fair Housing Act . . . by targeting Plaintiff for inferior services relating to real estate transactions because of her race and by generally engaging in advertising that is designed to target African Americans." *Id.* at 735. The court held that the plaintiff's claims fell with the scope of an arbitration clause and dismissed the case on that basis. *See id.* at 742. It therefore did not have to decide whether the allegation that the defendants violated the FHA by targeting the plaintiff for inferior services because of her race was sufficient to state a claim for racial discrimination under the statute. The arbitration clause in this case is in the contract with Con Praedia, who Plaintiffs have not sued. Thus, this Court is faced with deciding the issue not addressed in *Davis*. The Court concludes that Plaintiffs' allegation of targeting in this case describes the modus operandi of the alleged fraudulent enterprise, rather than a discriminatory motive. That is, Defendants used Plaintiffs' race or national origin (more properly, their immigrant status) to select them to be a victim to cheat based

14

on Defendants' perception that their race or national origin made them more susceptible to the alleged scheme. But a modus operandi with a discriminatory effect does not equate to a discriminatory motive, as the Seventh Circuit has explained:

> Whether or not the judge must instruct the jury that disparate treatment means intentional discrimination, he should not confuse them by equating a difference in outcome to a difference in treatment. . . . [T]he unlawful conduct is treating a person differently because of the person's race, as distinct from treating a person differently because of other, noninvidious characteristics which may be correlated with race. It is that distinction which must be preserved. Maybe more people who want to live in integrated communities are black than white, but the broker who shows a black person houses in an integrated community because that person requests to see houses there is not treating him differently because of race.

*Vill. of Bellwood,* 895 F.2d at 1530.

Similarly, here Plaintiffs' susceptibility to being a victim is alleged to be correlated with their immigrant status, which in turn is correlated to their race or national origin, but the correlation does not equate to discriminatory treatment. *Wiltshire* exemplifies this point in the context of an FHA claim. The plaintiffs in that case alleged various misrepresentations were made by the seller and other defendants acting in concert with the seller. Plaintiffs attempted to allege a claim under the FHA on the theory that, "because of their race," the seller "pressured or coerced" them into certain transactions with other defendants to facilitate the financing for plaintiffs' home, and that defendants "lured inexperienced and lower middle income minority buyers into purchasing homes that they could not afford"

15

and further were overpriced and over-appraised. *Wiltshire,* 421 F. Supp. 2d at 552. The defendants moved to dismiss, arguing that the plaintiffs had "not articulated any action taken by them *because of* plaintiffs' race, color, or national origin." *Id.* (emphasis in original). The court agreed, stating:

> Selling a home to a minority buyer is not discrimination. Selling a defective home to a minority buyer and concealing the defects through fraud is not discrimination.

*Id.* at 553. Similarly, selling bogus foreclosure services to an immigrant from Romania is not discrimination. And, while Plaintiffs allege that they were sold bogus foreclosure services *because* they are from Romania, the facts alleged defeat any plausible inference that the "because of" means because of racial or national origin animus. Instead, Plaintiffs specifically allege that they were targeted because, as Romanian immigrants, they were easy prey. Being easy prey is a "noninvidious characteristic," which, although possibly correlated with race or national origin because of language issues or unfamiliarity with American customs, is not a characteristic protected under the FHA or the Civil Rights statutes.

The Court recognizes that, at least in the employment context, a party may rely on a conclusory allegation of a discriminatory motive to avoid a motion to dismiss. *See, e.g., Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 827 (7th Cir. 2014). But the Court need not accept a conclusory allegation of motive or intent at face value in this case because other more specific facts alleged in the complaint show that Plaintiffs' claim is really that their victimization was not because of an animus against their country of origin but instead because of Defendants' belief that their country of origin made them susceptible to being victimized. *See Ashcroft v. Iqbal*,

16

556 U.S. 662, 686 (2009) (courts are not required to "credit a complaint's conclusory allegations without reference to its factual context"). Moreover, even absent the specific allegations made by Plaintiffs to the effect that it was their naiveté which made them targets, not racial animus against their ethnic heritage, the Court could not plausibly infer a discriminatory motivation in the context of allegations of a scheme to defraud such as those here. There is simply no plausible reason to believe that, assuming Defendants are guilty of the scheme to defraud alleged, they would forego victimizing non-Romanians who were similarly susceptible to their fraudulent scheme. An "equal opportunity" victimizer, whatever else he may be charged with, is not subject to liability for discrimination. *Cf. Holman v. Indiana*, 211 F.3d 399, 403 (7th Cir. 2000) ("Title VII does not cover the 'equal opportunity' . . . harasser" because "such a person is not discriminating on the basis of sex. He is not treating one sex better (or worse) than the other; he is treating both sexes the same (albeit badly)."); *see also Moranski v. Gen. Motors Corp.*, 433 F.3d 537, 541-42 (7th Cir. 2005) ("General Motors refuses to grant Affinity Group status to any group on the basis of any position with respect to religion. . . . The Affinity Group Guidelines treat employees with all religious positions identically . . . . This is not discrimination 'because of' religion, and the district court properly granted General Motors's motion to dismiss for failure to state a claim upon which relief could be granted.").

## CONCLUSION

Plaintiffs have made serious allegations, which, if true, detail an egregious fraud. But that is all Plaintiffs' allegations show: a fraud (and possibly negligence and/or breach of contract) case, not a federal discrimination case under either the Fair Housing Act or §§ 1981 or 1982. The Court indicated at the hearing, when it gave the parties its preliminary views on the current motions to dismiss, that Plaintiffs would be allowed the opportunity to file an amended complaint. But having further considered the matter, the Court is of the opinion that Plaintiffs' federal discrimination claims are not plausible regardless of any additional factual allegations they might make. Therefore, Plaintiffs federal law claims are dismissed with prejudice. The dismissal of Plaintiffs' federal claims leaves this Court without sufficient reason to retain jurisdiction over this case, *see United Mine Workers v. Gibbs*, 383 U.S. 715 (1966), and so the Court will leave it to the state court to decide whether Defendants have engaged in a fraudulent scheme, committed attorney malpractice, and/or breached their contracts with Plaintiffs.

Accordingly, Defendants' Motions to Dismiss, R. 12, 17, and 18, are granted. Plaintiffs' federal law claims are dismissed with prejudice and their state law claims are dismissed without prejudice to their refiling in state court.

ENTERED:

_____
Honorable Thomas M. Durkin
United States District Judge

Dated: November 22, 2016